**Sandra L. BLUE, Plaintiff–Appellant,**

**and**

**Mattiebelle C. Harris, Samuel P. Sheppard, Edward R. Humphrey, Robert L. Evans, Beulah Mae Harris, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia Walker, Thelma Curry, John Smith,**

James N. Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants–Appellees.

Beulah Mae HARRIS,
Plaintiff–Appellant,

and

Mattiebelle C. Harris, Samuel P. Sheppard, Edward R. Humphrey, Robert L. Evans, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia Walker, Thelma Curry, John Smith, James N. Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Sandra L. Blue, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants–Appellees.

In re FERGUSON, STEIN, WATT, WALLAS & ADKINS, P.A., Appellant.

Mattiebelle C. HARRIS, Samuel P. Sheppard, Edward R. Humphrey, Robert L. Evans, Beulah Mae Harris, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia

Walker, Thelma Curry, John Smith, James N. Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Sandra L. Blue, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants.

In re Geraldine SUMTER, Appellant.

Mattiebelle C. HARRIS, Samuel P. Sheppard, Edward R. Humphrey, Robert L. Evans, Beulah Mae Harris, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia Walker, Thelma Curry, John Smith, James N. Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKellar, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Sandra L. Blue, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants.

In re Julius L. CHAMBERS, Appellant.

Mattiebelle C. HARRIS, Samuel P. Sheppard, Sandra L. Blue, Edward R. Humphrey, Robert L. Evans, Beulah Mae Harris, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia Walker, Thelma Curry, John Smith, James N. Fleming, Geraldine Ballew, Robert Bronson, Omie

White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants–Appellees.

NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.,
Appellant,

and

Mattiebelle C. Harris, Samuel P. Sheppard, Edward R. Humphrey, Robert L. Evans, Beulah Mae Harris, Leonetta Bibby, Annette Todd, William Kincy, James T. Love, Manuel Early, Bernard Fields, Betty Reid, Lynn Siler, Lelia Walker, Thelma Curry, John Smith, James N. Fleming, Geraldine Ballew, Robert Bronson, Omie White, Carlton Giles, Edith B. McMillan, Mitchell McKeller, Carol J. Anderson, Veola McLean, Alicia Chisholm, King S. Cameron, Jeane Hendon, Joyce Malone, Deborah McMillan, Doris Turner, Violet Henderson, Nancy Alexander, Catherine Gutierrez, Nancy McGlone, Jessie Williams, Dianne Sheppard, Leonza Loftin, Sandra L. Blue, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE ARMY, John O. Marsh, Jr., Secretary, U.S. Department of the Army, Defendants–Appellees.

Nos. 88–1364, 88–1376 to 88–1380.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1990.

Decided Sept. 18, 1990.

As Amended Oct. 12, 1990.

Bonnie Kayatta–Steingart, Fried, Frank, Harris, Shriver & Jacobson, New York City, William Clarence McNeill, III, Employment Law Center, San Francisco, Cal., George Cochran, Law Center, University, Miss. (John Sullivan, Douglas H. Flaum, Tricia Kallett Klosk, Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, New York City, Cressie H. Thigpen, Jr., Raleigh, N.C., Morton Stavis, Center for Constitutional Rights, New York City, Stephen B. Burbank, University of Pennsylvania Law School, Philadelphia, Pa., Georgene Vairo, Fordham Law School, New York City, Jerold Solovy, Laura Kaster, Jenner & Block, Chicago, Ill., Barrington D. Parker, Jr., Leslie D. Callahan, Morrison & Foerster, New York City, on brief), for appellants.

Mark B. Stern, Civil Div., U.S. Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Robert S. Greenspan, Thomas M. Bondy, Civil Div., U.S. Dept. of Justice, Washington, D.C., Margaret P. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellees.

Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

In this case we must determine whether the district court erred in imposing sanctions on two Title VII plaintiffs, their counsel, and counsel's law firm. The court invoked a number of different yet overlapping legal theories to justify its imposition of sanctions, including Federal Rules of Civil Procedure 11 and 16, the "bad faith" exception to the American Rule, and 28 U.S.C. § 1927. In imposing the sanctions, the court ordered not only that defendant be awarded payment for court costs and attorneys' fees, but also that the court itself be reimbursed for the expenses it incurred and the time it spent presiding over the litigation. It also directed that the NAACP Legal Defense Fund not pay any part of the sanctions for the lawyers involved in the case. *Harris v. Marsh*, 679 F.Supp. 1204 (E.D.N.C.1987). Plaintiffs, counsel, counsel's law firm, and the Legal Defense Fund challenge the propriety of the sanctions on numerous factual and le-

gal grounds. Finding merit in some, but not all, of their contentions, we affirm in part and reverse in part the judgment of the district court.

## I.

In the spring of 1980, two civilian employees at the United States Army base at Fort Bragg, North Carolina, contacted Julius Chambers, a civil rights attorney from Charlotte, North Carolina, concerning an administrative class action they had filed alleging racial discrimination at Fort Bragg. Chambers conferred with statisticians at that time and was assured that their analyses demonstrated statistically significant racial effects in a number of employment practices at Fort Bragg. He agreed to represent two potential class members in the processing of the administrative complaint. During the administrative proceedings, the EEOC Complaints Examiner concluded that a class should be certified with respect to the claims of discriminatory promotions and reprisal.

A class action complaint was filed in federal court by Chambers in September 1981 with appellant Sandra Blue as one of five class representatives. Plaintiffs maintained that the United States Army had discriminated on the basis of race against them and other similarly situated black civilian employees at Fort Bragg with respect to numerous employment opportunities, in violation of section 717(a) of Title VII, 42 U.S.C. § 2000e–16(a). They sought back pay and injunctive and other equitable relief on behalf of themselves and the class.

The suit was the largest class action in employment discrimination ever filed against the United States Army. Hundreds of military and civilian employees were charged with racially discriminatory actions. Plaintiffs' allegations of racial discrimination were wide-ranging. They accused the Army of engaging in discriminatory practices in virtually every aspect of civilian employment: in hiring and promotion criteria, pay practices, job assignments, job performance evaluations, disci-plinary actions, reductions-in-force, and numerous aspects of on-the-job treatment.

Massive discovery began in November of 1981. An estimated five million documents were produced in the course of discovery, the majority by the Army. In addition, one hundred and forty-nine depositions were ultimately filed with the court.

In January of 1983, Geraldine Sumter, a young attorney eighteen months out of law school and six months out of a judicial clerkship, joined Chamber's law firm and was assigned to this case. She was one of only two associates assisting Chambers full-time on the case. Minor research assistance was provided by several other attorneys.

Discovery ended in February 1983, and a hearing was held in May 1983 to determine whether the litigation should go forward as a class action. In July 1983 the district court denied class certification because plaintiffs had failed to meet the factual predicate necessary for certification. In late August 1983, the court permitted forty-four persons, including appellant Beulah Mae Harris, to intervene as plaintiffs.

Discovery, which had been closed, was re-opened for several months on the claims of the intervenors. Numerous pretrial motions were filed by both parties. In December 1983, the court entered a final pretrial order disposing of these motions. Among the court's rulings in the pretrial order was its grant of the motions of eleven intervenors, not including Harris, to withdraw as plaintiffs. The motions to withdraw were filed within approximately one month after the motions to intervene. No reasons were given for the withdrawals. The pretrial order also specified the claims to be heard, witnesses to be called, exhibits to be offered, and so on, for all the original plaintiffs and the Army. Suit was thus set to go forward with thirty-eight individual plaintiffs. Trial was scheduled to begin in January 1984, with Blue to be the third plaintiff to have her claims heard.

The trial of the first plaintiff's claims began as planned in January 1984. Shortly before Blue's portion of the case was to begin in April 1984, she submitted her pre-

trial brief setting forth the claims she intended to try. The pretrial brief did not include a number of claims which Blue had earlier indicated she intended to litigate (as reflected in the pretrial order), and which the Army had prepared to rebut. The Army filed a motion for sanctions on the ground that Blue had abandoned the claims and in so doing had prejudiced the Army. The court took the motion for sanctions under advisement, and the remainder of Blue's claims went to trial in April 1984. Blue's case-in-chief was completed by late April, but pressing litigation and other matters required that the court recess the remainder of Blue's case for approximately four months.

Over these next few months, thirteen additional plaintiffs sought to withdraw from the lawsuit, moving for voluntary dismissal of all their claims under Fed.R. Civ.P. 41(a)(2). Harris was among the plaintiffs who sought to withdraw. The Army acquiesced in the plaintiffs' motions to withdraw, but moved for sanctions based on the waste of the Army's time in preparing for the groundless suits and on abuse of the judicial process. The district court granted the motions to withdraw, but reserved the government's sanctions motions on the abandoned claims.

Also, in July 1984, Julius Chambers assumed the position of Director–Counsel of the NAACP Legal Defense Fund, and his involvement in the case diminished significantly. In addition, the other associate working on the case left the employ of Chambers' firm. Thus, in the middle of trial of Blue's claims, Sumter was left for all practical purposes in charge of the litigation. While Chambers did make a number of appearances before the court after July 1984, these appearances were infrequent, and it was clear that Sumter had assumed primary responsibility for the day-to-day conduct of the litigation.

Blue's trial resumed in August and ended in September 1984. The trials of the remaining plaintiffs began in September and after a break beginning in late September resumed again in late February 1985. In March 1985, the parties reached a partial settlement, according to which the Army agreed to pay all plaintiffs as a group $75,000 and to continue to implement its affirmative action program in good faith. All remaining plaintiffs whose cases had yet to be heard agreed to dismiss their claims. The court was still to adjudicate those claims which it had already heard, as well as all sanctions motions.

In March and April 1985, the court conducted extensive sanctions hearings to determine the reasons why plaintiffs had abandoned their claims and whether the claims were frivolous. It heard several weeks of testimony and argument by the parties. On July 31, 1985, the parties reached a "final agreement" nullifying and superseding the earlier settlement. Pursuant to the final agreement, the substantive claims of all plaintiffs except Blue and the sanctions motions against all plaintiffs except Blue and Harris were dropped. Blue and Harris were not included in this settlement because they declined to sign the final agreement or somehow missed their opportunity to do so. Thus, still before the court were the merits of Blue's tried claims and the government's motions for sanctions against Blue, Harris, and their counsel for their abandoned claims. Both sides submitted briefs, affidavits, and other materials on the remaining claims and sanctions motions, and final pleadings were filed in early November 1985.

In an opinion dated December 28, 1987, the district court rejected as frivolous Blue's tried claims of discrimination and awarded sanctions based on the abandoned claims against Blue, Harris, Chambers, Sumter, Chamber's law firm, and certain other attorneys involved in plaintiffs' representation. It ruled that the claims which Blue and Harris had dropped were frivolous, that Blue and Harris had committed perjury, and that both plaintiffs and their counsel had either entered into or maintained the baseless litigation in bad faith.

.Combined sanctions totalled approximately $85,000. The sanctions were apportioned in the following manner: $17,000 against Harris, $13,000 against Blue, $30,-000 against Chambers, $12,500 against

Sumter, approximately $1,414 against the law firm of Ferguson, Stein, Watt, Wallas & Adkins, and the remainder against other attorneys involved in the case in lesser capacities. Sanctions were imposed on Blue under the bad faith exception to the American Rule, on Harris under both the bad faith exception and Rule 11 of the Federal Rules of Civil Procedure, and on counsel under the bad faith exception, Rules 11 and 16 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1927. The court calculated the sanctions in such a manner as to allow the Army to recoup its attorneys' fees and other expenses incurred in preparing for the abandoned claims, and also to allow the court to recover for the salaries of the court staff and other expenses of the court in resolving the litigation. The court also forbade the NAACP Legal Defense Fund from paying any of the sanctions for the attorneys. In addition, the court found that counsel had committed an ethical violation in persisting in the representation of two clients with conflicting interests. The court reprimanded and fined counsel for this behavior.

On motion for reconsideration, the district court rejected Sumter's argument that she should not be sanctioned because she was merely an associate working at the direction of Chambers, the leading partner in her law firm. The court found that Sumter was plaintiffs' chief counsel at trial while much of the misconduct occurred. However, the court did vacate the sanctions with respect to one attorney who played only a minor role in plaintiffs' representation. In addition, the court considered the Army's motion that sanctions be granted on the basis of Blue's pursuit of frivolous claims that were actually tried by the court, in addition to the sanctions which had already been imposed for the abandoned claims. The court granted such sanctions against Blue, Chambers, and Sumter in the combined amount of $10,000.

Blue, Harris, Chambers, Sumter, the law firm, and the NAACP Legal Defense Fund all appeal.

## II.

A myriad of different legal theories exist upon which sanctions can be imposed on attorneys and parties for engaging in improper conduct. Here, the district court relied upon four such theories in awarding sanctions: Rules 11 and 16 of the Federal Rules of Civil Procedure, the "bad faith" exception to the American Rule, and 28 U.S.C. § 1927. While these legal theories approach attorney and party misconduct from different perspectives and have differing standards, all share the common goal of the efficient litigation of meritorious suits and the deterrence of suits so patently meritless that their pursuit constitutes an abuse of the judicial system.

A brief review of the sanctions theories invoked by the district court reveals their similarities and differences. Rule 11 mandates that every pleading, motion, or other paper filed with the court be the product of a "reasonable inquiry" on the part of the attorney or party signing the document, and that the document be "well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it ... not [be] interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R. Civ.P. 11. Rule 16 provides for sanctions "if a party or party's attorney fails to participate in good faith" in a pretrial conference. Fed.R.Civ.P. 16(f). Under the bad faith exception to the American Rule, a court may award attorneys fees against a losing party or attorney who has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). Finally, 28 U.S.C. § 1927 provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

It is clear from the legal standards through which these sanctions operate that there can in many cases be significant overlap among them. In a proper case, several of the theories can be invoked to justify punishment of the same conduct. *See Blair v. Shenandoah Women's Center, Inc.,* 757 F.2d 1435, 1437 (4th Cir.1985). The district court here took just such an approach, holding much of the conduct it found improper to be punishable under several of the theories. Rather than dissect the particulars of each theory as applied to each of the district court's findings of improper conduct, we think it more straightforward to examine the basic question of whether the actions of plaintiffs and their counsel in pursuit of this lawsuit in fact constituted sanctionable conduct.

### III.

█ It is important at the outset to place this case in proper context. We are mindful of the role that federal courts have played in the struggle for equal opportunity under law. It was in the federal courtroom that litigation brought to life the abstract guarantees of racial justice. That development has not been a static one. Many rights and remedies once thought novel and unprecedented won the approval of the Supreme Court of the United States. The most important of these cases were, certainly at the time, the subject of the most intense debate and controversy. *See, e.g., United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Keyes v. School Dist. No. 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Green v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Brown v. Board of Ed.,* 347 U.S. 483, 74 S.Ct. 686, 98

L.Ed. 873 (1954); *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950).

At no time during this passage was the courtroom debate, for all its intensity, stilled by the specter of sanctions. The fact that a civil rights litigant pressed a legal position which courts had previously rejected was not thought to constitute a species of sanctionable conduct. If it had been, the parties and counsel who in the early 1950s brought the case of *Brown v. Board of Ed.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), might have been thought by some district court to have engaged in sanctionable conduct for pursuing their claims in the face of the contrary precedent of *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). The civil rights movement might have died aborning.

The case before us was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Supreme Court has cautioned district courts not to casually impose sanctions on Title VII plaintiffs and their counsel:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421–22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

At the same time, however, no litigant can be allowed to abuse federal courts or opposing litigants with impunity. Like all other litigants, civil rights litigants face the prospect of sanctions if they pursue patently frivolous lawsuits. "Racial or religious discrimination is odious but a frivolous or malicious charge of such conduct ... is at least equally obnoxious." *Carrion v. Yeshiva Univ.,* 535 F.2d 722, 728 (2d Cir. 1976). Equality under law means that the rules of law, including those concerning sanctions, apply to everyone. *See Oliveri*

*v. Thompson,* 803 F.2d 1265, 1280–81 (2d Cir.1986). It would be an irony if the concept of equality under law, so fundamental to the goal of civil rights, were underwritten with exceptions for Title VII litigants from the legal rules that apply to all others. The authority which federal courts possess, an authority often summoned to the side of racial justice, is an authority built upon respect for judicial process. That authority cannot, in the long run, be effectively invoked on behalf of civil rights enforcement if civil rights litigants could themselves disregard it with impunity. A careful balance must be struck between chilling Title VII claims, so central to the concept of equal opportunity, and saying that accusations, no matter how unfounded, may be brought immune from the usual rules of law which govern litigants.

From the perspective of this balance, the means by which the district court imposed sanctions upon Ms. Blue, Ms. Harris, and their counsel in this case gives us pause. The sheer breadth and magnitude of its sanctions effort are probably unprecedented. In a lengthy opinion, *see* 679 F.Supp. at 1204–1393, the district court not only invoked every conceivable legal theory on which sanctions could be imposed, but also levied every conceivable sanction, including attorneys' fees, court costs, court salaries (including that of its law clerk), and even a fine and reprimand of counsel for violation of state ethical rules. While the district court's approach undoubtedly was a manifestation of its frustration with the conduct of the parties and of counsel in pressing this protracted litigation as well as an expression of its determination that deleterious claims be forever deterred, an edict of such imposing dimensions may chill meritorious as well as meritless claims and dissuade deserving parties from ever bringing suit for fear of the concomitant burden of sanctions. Congress had a momentous purpose in mind when it enacted Title VII, which was nothing less than the eradication of discrimination in employment throughout society. We are unwilling to witness the evisceration of this purpose through sanctions awarded in a manner that leaves a lasting reluctance on the part of plaintiffs to vindicate the legal rights which Congress gave them.

■ The government was also the party that sought and was awarded sanctions here. Why it sought sanctions from plaintiffs rather than, for example, moving for summary judgment remains something of a mystery. The government in this case never moved to dismiss any of Blue's or Harris' claims on the merits, but instead waited until plaintiffs had dropped their claims to move for sanctions on the ground that the dropped claims were frivolous and were brought and abandoned in bad faith. Ordinarily, Title VII claims that are plainly meritless should be disposed of early in the course of litigation through summary judgment or other pretrial motion. The cases in which summary judgment has been granted a Title VII defendant, even after plaintiff was able to establish a prima facie case of discrimination, are numerous. *See, e.g., Mays v. Chicago Sun–Times,* 865 F.2d 134, 137 (7th Cir.1989); *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280–82 (7th Cir.1985); *International Woodworkers v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1271 (4th Cir.1981). As a general matter, dismissal of a frivolous Title VII case on the merits should be a first option, whereas imposition of sanctions should be a matter of last resort.

The law and indeed the equities do not all run in one direction, however. As a matter of law there is no requirement that a party move for summary judgment as a precondition to the recovery of sanctions. Numerous courts have awarded sanctions to prevailing defendants in Title VII cases despite the fact that plaintiffs were allowed to present their cases. *See, e.g., Lewis v. Brown & Root, Inc.,* 711 F.2d 1287 (5th Cir.1983); *Coleman v. General Motors Corp.,* 667 F.2d 704 (8th Cir.1981); *Carrion,* 535 F.2d at 723. "Cases that are ultimately viewed as frivolous may well survive . . . motions for summary judgment in which the evidence may be presented in sketchy fashion and credibility may not be taken into account." *Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 940 (2d Cir.), *vacated on other grounds,* 875 F.2d 39 (2d Cir.

1989). Similarly, there is nothing legally improper about a district court invoking a number of different legal theories to justify its imposition of sanctions. As a matter of fact, it is not particularly unusual for courts to rely on a number of sanctions theories. *See, e.g., Cruz v. Savage*, 896 F.2d 626, 632–35 (1st Cir.1990) (Rule 11 and § 1927); *Alvarado–Morales v. Digital Equipment Corp.*, 843 F.2d 613, 618 (1st Cir.1988) (Rule 11 and § 1927); *Shenandoah Women's Center*, 757 F.2d at 1436 (bad faith exception and Rule 11); *Kendrick v. Zanides*, 609 F.Supp. 1162, 1173 (N.D.Cal.1985) (bad faith exception, Rule 11, and § 1927); *Day v. Amoco Chemicals Corp.*, 595 F.Supp. 1120, 1122–25 (S.D.Tex. 1984) (bad faith exception, Rule 11, and § 1927). The elaborateness of the district court's sanctions effort is, in part, attributable to the complex and protracted nature of the underlying case and to the effort on the part of a conscientious district court to explain its course of action. An appellate court has a duty not to leave litigants at the mercy of arbitrary district court actions, but it also has a duty not to leave district courts defenseless against those who would abuse the privilege of litigating in them. Once again, appellate review must seek an appropriate balance.

With these principles in mind, we turn to the question whether the district court erred in determining that the conduct of plaintiffs and their counsel was sanctionable.

## IV.

Plaintiffs and their counsel forward two arguments that the district court erred as a matter of law in its award of sanctions. First, they argue that their ability to establish a prima facie case for each of their claims of racial discrimination insulates them from the imposition of any sanctions. Second, they contend that § 706(k) of Title VII prevents the government from ever recovering sanctions when it is the prevailing party in a Title VII suit. We will address each of these arguments in turn.

## A.

■ Plaintiffs and their counsel maintain that for each of their claims found frivolous by the district court, they were capable of establishing a prima facie case of racial discrimination under Title VII. They further contend that if the Army had then failed to rebut the prima facie cases, plaintiffs would have prevailed. Thus, they argue, the fact that they were capable of establishing prima facie cases automatically renders erroneous the district court's findings of frivolousness and dictates that their sanctions be reversed.

We cannot agree that the mere establishment of a prima facie case of discrimination will by itself insulate litigants and their counsel from sanctions. The requirements for establishing a prima facie case of racial discrimination under Title VII are, understandably, low: A plaintiff need only demonstrate that she is a member of a protected class, that she applied and was qualified for the position, that she was rejected, and that the employer either continued to seek applicants for the position or filled it with an applicant who was white. *See Patterson v. McLean Credit Union*, ── U.S. ──, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989).

A plaintiff's ability to meet this low threshold does not render sanctions inappropriate for the continued litigation of an otherwise patently frivolous case. It will often become plainly apparent in discovery that the employer has produced a legitimate explanation for the employment decision of which plaintiff complains. It is then plaintiff's burden to present evidence that the employer's explanation is a mere pretext for racial discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Clearly, if plaintiff has no evidence whatsoever of pretext, the continued litigation of plaintiff's case can be frivolous despite the existence of a prima facie case. *See Introcaso v. Cunningham*, 857 F.2d 965, 967–68 (4th Cir.1988) ("[I]t is possible for a plaintiff to establish a prima facie case ... which is nonetheless groundless....").

The Supreme Court contemplated as much when, in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), it indicated that sanctions are appropriate for pursuing a case after it becomes clear that the case is without merit. The Court noted that sanctions are appropriate where a "plaintiff is found to have brought *or continued* such a claim in bad faith." *Id.* at 422, 98 S.Ct. at 701 (emphasis added). "[D]ogged pursuit of a colorable claim becomes actionable bad faith once the attorney learns (or should have learned) that the claim is bound to fail." *In re TCI, Ltd.*, 769 F.2d 441, 445 (7th Cir.1985). Of course, we do not insist that plaintiffs have an air-tight case in order to bring suit in federal court. However, litigants and their counsel are not free, simply because they can meet the requirements of a prima facie case, to disregard evidence that comes to light in discovery and to continue to press their case without any reasonable belief that plaintiffs actually were the victims of racial discrimination.

■ Plaintiffs and their counsel also complain that the district court applied an incorrect legal standard in arriving at the conclusion that plaintiffs failed to establish a prima facie case under Title VII. They argue that the district court, following this court's precedent in *Holmes v. Bevilacqua*, 794 F.2d 142 (4th Cir.1986) (en banc), indicated that in order to establish the fourth element of a prima facie case, plaintiff must not merely show that the person ultimately selected for the position was white, but instead had to present "some other evidence that h[er] race was a factor" in the adverse employment decision. *Id.* at 147. They contend that this statement of the law is an incorrect one in light of the Supreme Court's decision in *Patterson v. McLean Credit Union*, — U.S. —, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989), which noted that a plaintiff need only show that the ultimate selectee was white in order to prove the fourth element of a prima facie case. They argue that this error requires that we set aside the district court's findings of frivolousness.

Plaintiffs' statement of the law is certainly a correct one, but it does not permit us to overturn outright the district court's award of sanctions in this case. The district court, recognizing that this area of the law was in a state of flux, expressly sought to "avoid this controversy" by assuming that plaintiffs had established a prima facie case of discrimination and examining the merits of their claims in this light. 679 F.Supp. at 1291. The district court repeatedly emphasized that it found the claims to be meritless and frivolous "even assuming" plaintiffs had established a prima facie case for each of their claims. *Id.* at 1288, 1289, 1290, 1291, 1292, 1293, 1310 n. 164, 1322. Plaintiffs proffered no credible evidence that any of the explanations given by the Army for employment decisions adversely affecting plaintiffs were pretexts for racial discrimination. Thus, any application by the district court of an incorrect standard of law with respect to the requirements of a prima facie case did not compromise its ultimate finding that plaintiffs' claims were frivolous.

All of this is not to say that the establishment of a prima facie case is irrelevant to determining whether sanctions are appropriate. To the contrary, this is always an important factor for a district court to consider, and especially so when the issue is whether a plaintiff's suit was frivolous at its inception. Sanctions should normally not be imposed for *filing* a frivolous Title VII claim where "[a]t the start of th[e] action" there was a reasonable belief that a prima facie case existed. *Greenberg*, 870 F.2d at 934–35. However, where, as here, the district court based its award of sanctions not simply on the filing of a frivolous suit but also on the prolonged maintenance of a frivolous suit well after the close of discovery, the establishment of a prima facie case will not invariably immunize plaintiffs and their counsel from sanctions.

**B.**

■ Plaintiffs and their counsel next contend that even if their conduct was otherwise sanctionable, the district court was precluded from awarding sanctions to the

**538**

Army by § 706(k) of Title VII. That provision permits a court to "allow the prevailing party, other than the [EEOC] or the United States, a reasonable attorney's fee." 42 U.S.C. § 2000e–5(k). Plaintiffs and counsel maintain that § 706(k) reflects an affirmative intent on the part of Congress to prevent the government from ever recovering sanctions when it is the prevailing defendant in a Title VII suit.

This argument is overbroad. Appellants' position would allow Title VII plaintiffs litigating against the government to violate their Rule 11 obligations, to act in bad faith, and otherwise to abuse the judicial process, free from the prospect of any kind of control by a court. Congress did not intend, merely by prohibiting the government from recovering attorneys' fees solely because it is the prevailing party, to vitiate the bad faith exception to the American Rule and to negate the explicit language of Rule 11, Rule 16, and § 1927. Appellants' position has been considered and rejected by other courts of appeals. In *Copeland v. Martinez*, 603 F.2d 981 (D.C. Cir.1979), the District of Columbia Circuit, after carefully reviewing the language, purpose, and legislative history of § 706(k), held that a district court may impose sanctions against a Title VII plaintiff who brings a bad faith action against the government. The court found no evidence that Congress intended in § 706(k) to preclude an award of sanctions for bad faith litigation, and, in fact, concluded that such a ruling would be contrary to the acknowledged purpose of § 706(k) "to 'deter the bringing of lawsuits without foundation.'" *Id.* at 986 (quoting *Christiansburg Garment*, 434 U.S. at 420, 98 S.Ct. at 700). The court went on to state that "[l]itigation brought merely to harass is a wholly unredeemed burden and affront to the judiciary. While its unfairness when the defendant is the United States is somewhat more diffuse than the imposition on a private defendant in the same circumstances, it is not more sufferable." *Id.* at 991. The Fifth Circuit has expressly agreed with the result reached in *Copeland. See Butler v. Dep't of Agriculture*, 826 F.2d 409, 414 (5th Cir.1987). Nothing in appellants' ar-

guments convinces us that we should depart from the holdings of these circuits. We find no intent in § 706(k) to preclude all awards of sanctions to the government no matter how egregious the conduct of the opposing party or counsel.

## V.

Plaintiffs and their counsel also contend that the district court abused its discretion in its imposition of sanctions by ruling that their claims were frivolous, vexatious, and brought in bad faith. After a brief discussion of the standard governing our review of a district court's award of sanctions, we will summarize the district court's findings of frivolousness, vexatiousness, and bad faith. We will then address appellants' contention that the district court abused its discretion in making these findings. We will also review the district court's findings that plaintiffs Blue and Harris committed perjury in their testimony before the court.

## A.

A district court's decision to impose sanctions is entitled to substantial deference. *See Fahrenz v. Meadow Farm Partnership*, 850 F.2d 207, 210 (4th Cir.1988). A district court "is in the best position to review the factual circumstances and render an informed judgment as [it] is intimately involved with the case, the litigants, and the attorneys on a daily basis." *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir.1988) (en banc). Thus, "assessment of frivolousness and attorneys' fees are best left to the sound discretion of the trial court after a thorough evaluation of the record and appropriate factfinding." *Arnold v. Burger King Corp.*, 719 F.2d 63, 66 (4th Cir.1983). The Supreme Court has recently indicated that "an appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination." *Cooter & Gell v. Hartmarx Corp.*, — U.S. —, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). The Court reasoned that

Rule 11's policy goals ... support adopting an abuse-of-discretion standard. The district court is best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal of specific and general deterrence. Deference to the determination of courts on the front lines of litigation will enhance these courts' ability to control the litigants before them. Such deference will streamline the litigation process by freeing appellate courts from the duty of reweighing evidence and reconsidering facts already weighed and considered by the district court; it will also discourage litigants from pursuing marginal appeals, thus reducing the amount of satellite litigation.

*Id.*, 110 S.Ct. at 2460. We think these considerations apply not only to sanctions imposed under Rule 11, but also to those imposed under the other sanctions theories relied upon by the district court. Thus, in accordance with *Cooter & Gell,* we will reverse the district court's imposition of sanctions here only if we find an abuse of discretion.

### B.

Our summary of the district court's factual findings is necessarily an abbreviated one. It is impossible to gain a full appreciation for the manner in which this litigation was conducted without reading the district court's opinion in its entirety. The district court here found that the claims abandoned by plaintiffs on the eve of trial and the claims of plaintiff Blue which were actually tried were frivolous, vexatious, and completely without merit. The court carefully examined each claim of each plaintiff and concluded that for virtually all the claims there was simply no evidence of racial discrimination. For example, with respect to Blue's tried claims the court noted that "[t]he record in this case is astonishing for its lack of evidence to support plaintiff's claim," 679 F.Supp. at 1297, and again that "[t]he record is literally void of evidence," *id.* at 1307. In all, the court determined that seven of Harris' nine abandoned claims were frivolous, as were nine of

Blue's eleven claims, including all of her tried claims. The court found plaintiffs' charges so lacking in credible supporting evidence that it had to conclude that the suits either were initiated in bad faith or were maintained so long after it became apparent that they were baseless that a finding of bad faith was required. In the district court's view, the only "evidence" ever advanced by plaintiffs on their claims were their own "unsubstantiated, self-serving, contradictory, and inconsistent claims of discrimination." *Id.* at 1267.

In addition, the court found that the abandoned claims were dropped at trial without just cause and in bad faith after the filing of the final pretrial orders. The court stated:

> Defendant had a right to rely on the pre-trial orders *sub judice* and to prepare accordingly. Yet, when the time came to try each plaintiff's claims, defendant was legitimately surprised by what claims that plaintiff was not pursuing. Plaintiffs' view appeared to be that since defendant effectively 'won' on any claim not prosecuted, defendant could not be heard to complaint—no harm, no foul. This cavalier attitude toward the physical and fiscal resources of the defendant and the court ... was and remains shocking.

*Id.* at 1226. Explanations provided by the parties for abandoning their claims were found by the court to be wholly incredible.

The district court laid the blame for the pursuit and abandonment of the frivolous claims at the feet both of the attorneys and of plaintiffs. The court stressed that "[p]re-trial, let alone pre-filing, investigation on nearly every claim alleged by plaintiffs and their counsel was wholly inadequate and, in many cases, seemingly nonexistent." *Id.* at 1378–79. It found as a factual matter that "[a]lthough plaintiffs' counsel expended a great deal of effort at securing defendant's documents and files, the litigation established their wholesale failure to read, digest, and analyze the material handed to them." *Id.* at 1379 n. 267. The court went on to state that "[i]f this had been done to any professional degree, it is inconceivable that many of plain-

tiffs' claims would have been filed and clearly none would have been maintained after the close of discovery." *Id.* at 1379. The court observed that

> plaintiffs cried discrimination, and counsel, despite a stunning paucity of evidence, filed suit, hoping defendant would surrender rather than go to trial. When defendant refused to bow down and fought back, plaintiffs went to trial, glaringly unprepared and without a case, apparently hoping to teach defendant a lesson and force a favorable settlement. Neither occurred. A better case for an award of attorney's fees against counsel could not be made.

*Id.* at 1380. The court concluded that "[n]o reasonable attorney could possibly have hoped to prevail in this case." *Id.* It also emphasized that "Rule 11 was violated with each and every filing of the plaintiffs relevant to the Blue and Harris claims from (and including) the Pre–Trial Orders forward (if not considerably before that date)." 123 F.R.D. 204, 229.

As to the plaintiffs themselves, the district court found not only that they had pressed frivolous claims the bases of which they had failed to investigate, but also that their testimony before the court was, at times, "patently perjurious." 679 F.Supp. at 1378. The court stated that "[a]nswers by plaintiffs to examination by defense counsel frequently were deliberately evasive," *id.* at 1379, and that plaintiffs' testimony "was astounding for its lack of candor and truthfulness," *id.* at 1224. Further, the court stated that

> [t]hese plaintiffs consistently testified either out of shocking ignorance or stunning disregard for the veracity of their allegations. Inconsistencies and evasiveness abound in their testimony and self-serving lapses of memory are fatally pervasive. Some of the factual allegations can most charitably be termed 'fantasies.' ... Reading the transcript of their testimony ... leads to one undeniable conclusion—on a number of occasions, [plaintiffs] lied.

*Id.* The court also found that "[w]hether plaintiffs' respective purposes were entirely vindictive, that is to damage the reputation of [Army personnel] and subject them to personal harassment, is not a question free from doubt. Clearly, however, plaintiffs were motivated by this thought at least in part and on a not infrequent basis in the litigation." *Id.* at 1379.

The court further held that the conduct of plaintiffs and their attorneys, observed by the court over a substantial period of time, mandated a finding of bad faith. After cataloguing the improper conduct it found on the part of plaintiffs and counsel, the court found that "[a]lthough none of these factors alone on any one claim would be sufficient to support a finding of bad faith, the synergistic effect of all the factors in combination with the number of frivolous claims alleged and maintained is devastating. The conclusion to be drawn from this disgraceful scenario is inescapable: the claims listed above either· were filed or, shortly thereafter, maintained and prolonged in bad faith." *Id.*

### C.

■ Plaintiffs and their counsel maintain that the above district court findings of frivolousness, vexatiousness, and bad faith are an abuse of discretion because there is evidence of racial discrimination in the record. In addition, they assert that the district court improperly transformed hindsight credibility determinations into factual findings of frivolousness. These questions are important here because if appellants are correct, the sanctions would be dissolved.

We have closely examined the record for evidence of racial discrimination. Giving plaintiffs' allegations the generous reading we believe they are due, we nonetheless are constrained to uphold the district court's factual determinations. Plaintiff Harris' strongest contention of discrimination was her own testimony at the sanctions hearing that she knew herself to be a victim of discrimination because a note she allegedly saw (but never produced) indicated that another applicant for a job for which she was applying had improperly been preselected for the job. Ignoring for

the moment the fact that the district court found Harris' testimony "impossible to believe," 679 F.Supp. at 1348, even if the testimony were accurate it would not without more indicate that she was the victim of racial discrimination. If one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job, black and white alike. While if Harris' allegation were true it might demonstrate that she, as well as all the other applicants for the job, may have been unfairly treated, it does not by itself prove racial discrimination. "Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination." *Casillas v. United States Navy*, 735 F.2d 338, 344 (9th Cir.1984). "[A]n ill-informed motivation, or even an illegal motivation, is not necessarily a discriminatory one. . . ." *Oates v. District of Columbia*, 824 F.2d 87, 93 (D.C.Cir.1987).

Similarly, plaintiff Blue's strongest evidence of unfair treatment fails to create any inference of racial discrimination. Blue charged that in response to a complaint she made to the union about an annual performance appraisal, one of her supervisors stated that he "would crucify anyone that ever went to the union." While the supervisor's statement was undoubtedly improper, there is no evidence that it was in any way racially motivated. In fact, Blue herself admitted that she did not remember whether the supervisor ever discriminated against her on the basis of race.

While, even if credible, Harris' allegation of preselection and Blue's allegation concerning the warning not to go to the union do not amount to proof of racial discrimination, neither are they much different from many claims which do not prevail but which are brought routinely without the imposition of sanctions. It is not sanctionable for a putative discriminatee to seek to demonstrate that unfairness in some generic sense may prove to be related to the victim's race. In fact, we cannot say that deviations from standard operating procedure and supervisor comments motivated by an unlawful animus of any sort would

not prove relevant in an appropriate case to claims of racial discrimination. If the above examples afforded the sole basis for the award of sanctions in this case, it would be a tenuous one.

The above examples were not, however, the sole basis for the award of sanctions. The district court here did not consider plaintiffs' strongest claims alone and isolated from all the other claims and all the other evidence presented in the case. Rather, the district court considered these claims in the context of a host of other claims of racial discrimination which were plainly without basis. For example, the evidence Harris submitted to support two of her claims consisted of a "gut feeling" that she was being discriminated against, based on a perceived lack of interest during her interviews or what she felt to be overly short interviews. As the district court noted, however, Harris came to the conclusion that she had suffered racial discrimination without comparing the length of her interviews or the perceived interest level of the interviewers with those of any other applicant, black or white. *See* 679 F.Supp. at 1350–52. No evidence comparing the treatment Harris received with the treatment of other applicants was ever introduced at the sanctions hearing to show that Harris' claims of discrimination were not frivolous. Contrary to the assertions of Harris and counsel, the district court did not merely assume that her claims were frivolous because they were abandoned, but rather it carefully examined the evidence underlying the claims and determined that the claims most likely were abandoned because they were frivolous. *See id.* at 1347–62. Similarly, the district court time and time again found Blue's claims to be unsupported by any credible evidence. *See, e.g., id.* at 1290–93, 1298–99, 1307.

Thus, the majority of plaintiffs' claims of racial discrimination rested on a "gut feeling" or had no evidence at all to support them. On the other side of the ledger, there was a sizeable quantity of tangible evidence introduced by the government of other explanations for the personnel decisions of which plaintiffs complain, none of

which explanations related in any way to plaintiffs' race. To give just one example, a number of Blue's co-workers and superiors, all found credible by the district court, detailed Blue's deficiencies as an employee. As the district court noted, Blue's peers and supervisors described her "as unprofessional, discourteous, confrontative, borderline insubordinate, average in her skills, and as an employee who had the ability to do a much better job if she had ever cared to do so." *Id.* at 1250. These descriptions were not simply impressionistic, but were documented by numerous instances of observed misconduct. Examples of Blue's on-the-job performance ranged from leaving patients unattended in the dental chair in violation of established policy to refusing to follow the instructions of her superiors to disrupting staff meetings. Blue's only response to these repeated descriptions of her conduct was that all of the witnesses were lying. The district court disagreed, however, and we are unable to ignore its factual findings. Nor are we able to ignore that plaintiffs blamed every adverse personnel action on racial discrimination, recklessly charging numerous government officials with racially motivated conduct. In light of the overall paucity of evidence of racial discrimination presented by plaintiffs and the overwhelming evidence of non-racially motivated explanations for the government's personnel decisions, we cannot say that the district court abused its discretion in finding plaintiffs' claims to be frivolous, vexatious, and brought in bad faith.

■ Counsel protest that they cannot be expected to have foreseen the credibility determinations made by the district court and to have realized that plaintiffs' claims would be found frivolous. However, the district court made plain that the resolution of this case turned upon far more than routine credibility determinations. As the district court explained:

> Defendant had produced an enormous amount of discovery—much of it clearly unrebutted by any credible evidence in plaintiffs' possession..... Counsel, certainly by this time (and with respect to Blue, well before) had no reasonable ba-

sis upon which to rely on either plaintiff. Significant gaps and inconsistencies existed in plaintiffs' respective versions of events mandating that counsel question their perception of discrimination. When conspiracy theories abound and every negative employment decision, whether effected by black or white, military or civilian personnel, is questioned on a racial basis, counsel have an obligation to inquire behind their client's claims. Here, access to investigate plaintiffs' stories was virtually unchecked. Yet, Harris' claims were filed, and Blue's continued, apparently without any objective thought as to their merit.

679 F.Supp. at 1387. Undoubtedly there are instances in which an attorney acts irresponsibly by failing to investigate the facts behind his client's claim and by instead relying solely on the client's testimony to support his case. "Counsel cannot escape liability, as they attempt to here, by relying solely on their belief that their clients genuinely feel that they were not fairly treated." *Davidson v. Allis–Chalmers Corp.*, 567 F.Supp. 1532, 1542 (W.D. Mo.1983). "No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985).

Here the district court found that if counsel had made a reasonable investigation of their clients' claims or a reasonable inquiry into the materials handed over to them in discovery, they would have realized that they had no credible evidence of racial discrimination. This counsel did not do. *See Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir.1986) ("Blind reliance on the client is seldom a sufficient inquiry...."). While we are mindful that district courts should not impose sanctions based on hindsight logic,

> [w]e do not believe that the district court in this case found the plaintiffs' claims frivolous because of any special wisdom received during the course of the litigation that was unknown to the plaintiffs' attorney[s] when the claims were

brought.... The plaintiffs' attorney[s] w[ere] in a position to know the claims were unsupported by fact or law prior to bringing the claims and throughout the litigation.

*Cruz,* 896 F.2d at 633. Thus, counsel cannot simply rely on a client's patently incredible testimony when any reasonable investigation of the factual bases for the client's claims or examination of materials obtained in discovery would reveal the paucity and implausibility of the evidence. Again, there is nothing to lead us to conclude that the district court abused its discretion in making its findings of frivolousness, vexatiousness, and bad faith, or in blaming both the parties and counsel for pursuit of these frivolous claims.[1]

### D.

■ Plaintiffs' challenges to the district court's findings of perjury on the part of Ms. Harris and Ms. Blue are equally unavailing. While an appellate court is unable to observe testimony first-hand and "taste[ ] the flavor of the litigation" in the same manner as a district court, *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174 (D.C.Cir.1985), our review of the record does not persuade us that the district court's findings of perjury were ill founded. The testimony of both Harris and Blue reveals contradictions and evasions on the most central of issues.

For example, when Harris first moved to withdraw her claims, she sought to do so without prejudice, arguing that it would be more convenient for the court to hear her claims together with other claims she was pursuing in an administrative forum but which she might bring before the court at a future date. After the court rejected Harris' motion, she agreed to withdraw her claims with prejudice. When questioned at the sanctions hearing as to why she had abandoned her claims, Harris forsook the convenience rationale, and asserted that she was financially unable to pursue her administrative claims and her court claims at the same time because it would require that she retain separate counsel. She was later forced to admit, however, that she was never required to make any financial contribution to litigation of the court case, but instead that any contributions she made were voluntary. The court found that she only contributed some $70 to the fund established to defray costs of litigation. In addition, Harris' administrative claims were handled at no cost to her by a union attorney. Moreover, Harris and her husband shared a combined annual income of over $30,000, as well as other substantial assets including, *inter alia,* a money market account, lakefront property, a boat, and a truck. Harris failed to mention any of these assets when originally questioned about her finances, only recalling these resources when directly confronted with their existence. Finally, Harris alleged at the sanctions hearing that she was forced to withdraw from the lawsuit because of the stress it had caused her. This belated explanation was never raised until her testi-

1. Nor does any statistical evidence demonstrate that the district court abused its discretion. Plaintiffs' lack of statistical evidence of discrimination was found by the district court to· be "shocking." 679 F.Supp. at 1225. The court stated that with respect to Blue's claims "there simply was no statistical presentation made ... even in support of her disparate *impact* allegations." *Id.* (emphasis in original). As for the statistical evidence presented in the claim of another plaintiff which Blue sought to have applied retrospectively to her claim, the court found that evidence so flawed as to be no evidence at all. For example, plaintiffs' expert witness failed to distinguish employees not referred for promotion under one challenged promotion criteria from those not referred under another, employed a sparse database for his projections, never attempted to control for the disproportionate effect some plaintiffs had on the statistics because of their multiple applications and non-referrals, and drew comparisons of the race of those promoted with the racial composition of the labor pool using a labor pool of little, if any, legal relevance. Ignoring all the multiple flaws in the statistical analysis, however, the district court still found that application of a standard deviation analysis to plaintiffs' data "reveal[ed] no legally significant difference between the referral rates of white and black applicants." *Id.* at 1298 n. 150. As the district court pointed out, plaintiffs' expert himself "essentially admitted on cross-examination that his analysis failed to show any statistically relevant fact about whether blacks at Fort Bragg had been discriminated against in the promotion process." *Id.* at 1225 n. 8.

mony at the hearing, and no documentary or anecdotal evidence was submitted to support it. Moreover, this explanation appears somewhat suspect in light of Harris' statement that she travelled approximately 90 miles to attend Blue's trial as a spectator in order to relax. In light of such testimony, it is not surprising that the district court would describe Harris' story as "a tortured path of inconsistent, evasive and wholly incredible explanations for an untimely decision made to abandon and dismiss a host of patently frivolous claims." 679 F.Supp. at 1340.

Blue's testimony as well was marked by "insidious and less than subtle shift[s]." *Id.* at 1317. For example, more than once Blue testified on direct examination that she had concluded that she was better qualified than other candidates for a job position after reviewing the other candidates' qualifications, only to admit on cross-examination that she had no knowledge of the other candidates' qualifications. *See id.* at 1277. On as basic an issue as whether a particular Army official had discriminated against her, Blue was unable to tell a consistent story. First, she testified that she could not remember whether he had discriminated against her, then she said he may have discriminated against her, and finally, after being shown her pre-trial deposition, she concluded that he did indeed discriminate against her. *See id.* at 1251. These are but a few examples of an oft-repeated scenario. Our review of the testimony in this case reveals that the district court did not err in finding that plaintiffs committed perjury.

### E.

In reviewing the district court's findings of frivolousness and perjury, we are cognizant of the fact that adverse credibility determinations are made in virtually every Title VII case, but are only infrequently the basis for an award of sanctions. Needless to say, every instance in which a district court credits one side's witnesses over another's is not an occasion for sanctions. We also recognize that the presence of discrimination can be pervasive

but that the proof of discrimination can be elusive. A "smoking gun" is often not to be found in a discrimination suit. Instead, Title VII plaintiffs must often prove their cases by circumstantial evidence, or "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Sanctions plainly are not appropriate simply because a party is attacking discrimination in its subtle guises.

Nonetheless, a line undoubtedly exists which separates efforts to attack discrimination in its subtler forms from baseless accusations of discrimination. Our thorough review of the record demonstrates that the district court did not abuse its discretion in finding that appellants crossed that line in this case. The picture the district court paints is a vivid one. The court makes clear that this is a case in which plaintiffs Blue and Harris leveled widespread charges of racial discrimination without any regard for the truth of their allegations, abandoned frivolous claims without notice after the Army had spent significant amounts of time and money preparing to rebut them, and perjured themselves, all in order to harass and embarrass the personnel at Fort Bragg; and, further, that this is a case in which counsel failed to perform their responsibilities of investigating the foundation for their clients' claims, failed to examine much of the material turned over to them in discovery, and simply pressed forward with their case heedless of whether the claims they were pursuing were legitimate ones.

Such conduct is undoubtedly sanctionable under the theories employed by the district court. *See, e.g., Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 453 (7th Cir.1987) (sanctions appropriate under Rule 11 where counsel has not made a reasonable inquiry into facts before filing papers with the court); *Nepera Chemical, Inc. v. Sea–Land Serv., Inc.,* 794 F.2d 688, 702 & n. 105 (D.C.Cir.1986) (sanctions appropriate under bad faith exception " 'where a party brings or maintains an unfounded suit' "); *Jones v. Continental Corp.,* 789 F.2d 1225, 1230 (6th Cir.1986) (sanctions appropriate when "an

attorney knows or reasonably should know that a claim pursued is frivolous"); *Dow Chemical Pacific Ltd. v. Rascator Maritime, S.A.*, 782 F.2d 329, 345 (2d Cir.1986) (sanctions appropriate for bad faith "in instigating or maintaining the litigation ... as exhibited by, for example, ... pursuit of frivolous contentions"); *In re TCI, Ltd.*, 769 F.2d at 445 ("If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious."); *Dreiling v. Peugeot Motors of America, Inc.*, 768 F.2d 1159, 1165 (10th Cir.1985) (sanctions awarded under § 1927 where the parties and their attorney "continued to assert claims for liability against [defendant] with knowledge that they had no factual or legal basis or claim of liability against him, and did so long after it would have been reasonable and responsible to have dismissed the claims"); *Eastway Constr. Corp.*, 762 F.2d at 254 ("[S]anctions shall be imposed against an attorney and/or his client when it appears that ... after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact. ... "); *Perichak v. International Union of Electrical Radio & Machine Workers, Local 601, AFL–CIO*, 715 F.2d 78, 83 (3d Cir. 1983) (sanctions imposed where plaintiff's

claims were unsupported by evidence and plaintiff made a "material false statement under oath"); *Brown & Root*, 711 F.2d at 1291 (sanctions awarded where "the evidence offered by [plaintiff] did not demonstrate, even by inference, any unlawful discrimination"); *Nemeroff v. Abelson*, 704 F.2d 652, 659 (2d Cir.1983) (sanctions awarded against plaintiffs and attorneys when they maintained suit "when they should have realized that they had no support for their charges").[2]

## VI.

To conclude that the conduct of this litigation was sanctionable does not, however, end our inquiry into the propriety of the sanctions. We must also examine whether the district court erred in imposing sanctions on both the senior partner originally in charge of the litigation, Julius Chambers, and on the associate who was left to bring the lawsuit to its conclusion, Geraldine Sumter.

### A.

The district court imposed sanctions upon Sumter as "primary trial counsel" at the time much of the misconduct occurred. It concluded that because she was lead counsel during this period, "a significant

2. Appellants attack the district court's award of sanctions on two additional grounds. First, they suggest that the court's method for organizing the presentation of evidence caused confusion and led the court incorrectly to conclude that they had abandoned claims when they had not. They assert that certain of their claims were never meant to be claims for relief to be presented in the first phase of the trial, but instead were only meant to be introduced as background evidence of discrimination in a later phase of the trial. They argue that they did not abandon these claims, but reserved them to be introduced in the later phase.

This argument is without merit. While appellants may never have intended these claims to be claims for relief, there is nothing in the pretrial order or elsewhere to alert the defendant in this regard. Defendant was forced to prepare for these claims as if they were claims for relief because appellants never designated in the pretrial order that the claims were only being introduced as background evidence. As the district court noted:

> [B]ackground claims (some never denominated as such) and claims for relief were abandoned and merged with lightning speed ... at the whim of the plaintiffs and without any advance notice to defendant or the court. One was never certain, even on the eve of trial, of exactly what claims plaintiffs were pursuing, whether designated claims would be expressly waived, or whether claims, clearly designated for trial in the pre-trial order, would simply creep slowly and silently away into the night never to be heard from again.
> 679 F.Supp. at 1226.

Second, appellants suggest that their claims could not have been frivolous because the Army changed its promotion policies after the complaint was filed, abandoning some of the criteria for promotion challenged by plaintiffs. The Army altered its promotion policies in 1982 because of renegotiation of its collective bargaining agreement with the employees' union. There is nothing to suggest that the Army altered its policies because they had previously been discriminatory or that the changes were in fact a response to this lawsuit.

amount of the reckless, vexatious and frivolous conduct of plaintiffs is fairly laid to rest at Sumter's doorstep." 123 F.R.D. at 223. The court also apparently felt that since Sumter's conduct was sanctionable when viewed objectively, it was not free to take into account such considerations as her relative inexperience and the difficult position in which she was placed.

We think the district court took too narrow a view of its authority here. In awarding sanctions, a district court has the discretion to consider a broad range of factors. Even though an attorney has engaged in conduct which is otherwise sanctionable, "a district court should reflect upon equitable considerations in determining the amount of the sanction." *Brown v. Federation of State Medical Bds.*, 830 F.2d 1429, 1439 (7th Cir.1987). "[A] district court may, in its discretion, refuse to award attorney's fees even where it finds the existence of bad faith, if, in balancing the equities, it nevertheless determines that an award in a particular case would not serve the interests of justice." *Perichak*, 715 F.2d at 80. In exercising this discretion, a district court may consider such factors as an attorney's experience and whether the attorney entered the case at an advanced stage. *See Brown*, 830 F.2d at 1439.

Here, Sumter was placed on this massive case immediately after joining Chambers' firm, then known as Chambers, Ferguson, Watt, Wallas, Adkins & Fuller. She was only eighteen months out of law school, and only six months out of a judicial clerkship. Only one month remained in discovery when she entered the case. A year and one-half later, when Chambers became Director–Counsel of the NAACP Legal Defense Fund, Sumter was left as the attorney with primary responsibility for litigating the case. At times, she found herself litigating virtually alone against a defense team of eleven persons.

The sanctionable conduct on the part of the attorneys in this case was their widespread failure to perform their responsibilities as attorneys—to investigate the facts underlying their clients' charges of discrimination and to examine the materials handed over to them in discovery before proceeding with their case. Whatever its reason, this is a failure which cannot be ignored and which is deserving of sanctions. However, to place blame for the attorneys' failure on a very junior associate working on her first case for her firm, who entered the case near the end of discovery, who was merely following the directions of a senior partner in charge of the case, and who was left in the untenable position of lead counsel on a massive discrimination case for which the background factual investigation and corroboration had never been done is an unrealistic and unjust result. We do not think the district court gave adequate consideration to all these factors, and we are unwilling to see the career of a young attorney compromised at its inception because she found herself cast virtually alone into a case which a team of experienced lawyers would have deemed a daunting one. We therefore direct that the award of sanctions against Ms. Sumter be set aside.

### B.

We next proceed to address the award of sanctions against Mr. Chambers. Chambers was the experienced senior partner in charge of the case from its outset. He is fairly charged with responsibility for permitting a case of this dimension to go forward in the absence of evidence. He should have assured that the case was adequately staffed so that the factual bases of his clients' claims were investigated and the materials obtained in discovery were read and digested, and he should not have left an inexperienced junior associate in charge of such a massive litigation effort.[3]

---

**3.** While the parties quibble over various individual sanctions theories relied upon by the district court, we think it beyond cavil that the district court possessed the authority to impose sanctions. While we do not suggest that federal courts are in accord over the various particulars of every sanctions theory, it is clear that a core of sanctionable conduct exists and that all of the sanctioning authorities invoked by the court were intended to deter vexatious conduct, un-

Mr. Chambers' past professional conduct, however, has been that of a litigant who takes seriously an advocate's responsibility as an officer of the court. It is not beyond the ken of judicial notice to observe that Julius Chambers is a respected civil rights advocate who has contributed his considerable professional abilities to changing the life of a region for the better. He has played a valuable role in the efforts to realize equal opportunity under law, and he has been involved in the litigation of some of the Supreme Court's most significant civil rights cases. *See, e.g., Patterson v. McLean Credit Union, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).* His record of responsible advocacy before this court has been equally impressive. *See, e.g., Martin v. Charlotte–Mecklenburg Bd. of Ed., 626 F.2d 1165 (4th Cir.1980); Johnson v. Ryder Truck Lines, 555 F.2d 1181 (4th Cir.1977); Russell v. American Tobacco Co., 528 F.2d 357 (4th Cir.1975); Johnson v. Seaboard Air Line R.R., 405 F.2d 645 (4th Cir.1968).*

The question that confronts this court is whether this past record of professional responsibility and accomplishment should lead us to vacate the award of sanctions in the instant case. We cannot conclude, however, that the district court abused its discretion in awarding sanctions against him. *See Fahrenz,* 850 F.2d at 210. To find that the district court abused its discretion and to relieve Chambers of all sanctions here would be to issue an open invitation to distinguished attorneys across this country to challenge sanctions awarded against them on grounds that were ungermane to their performance in the particular

case. It would involve courts in an impossible task of reputational measurement. It would run counter to the notion that a court should look to a lawyer's conduct in the instant litigation in assessing his or her behavior, and that a lawyer's obligation to the court is renewed with each appearance. *See Rascator Maritime,* 782 F.2d at 345. It would also be unfair to opposing parties whose rights the sanctions were in part imposed to vindicate. Ultimately, it would be to hold the most prominent members of the legal profession above the law. Applying this standard, we hold that an award of sanctions against Mr. Chambers shall stand.

▮ We see no reason, however, why Mr. Chambers should shoulder those sanctions erroneously imposed upon Ms. Sumter. In order to fulfill the purposes of Rule 11 and the other sanctions theories invoked by the district court, it is important that we require the attorneys to pay a reasonable sanction; however, "[i]n this respect, 'reasonable' does not necessarily mean actual expenses and attorney's fees." *Fahrenz,* 850 F.2d at 211. The government may protest that if Chambers does not bear the full brunt of those sanctions originally imposed upon Sumter, then it will not be fully reimbursed for its fees. While this is true, the purposes of sanctions are several, and encompass deterrence as well as recompense. *Jackson v. Law Firm,* 875 F.2d 1224, 1229 (6th Cir. 1989). The former rationale may, in a particular case, mandate an award of sanctions that is either more or less than the actual costs and fees. Here, we believe that an appropriate note of caution can be sounded without requiring Mr. Chambers

necessary delay, and the prolongation of litigation with insubstantial claims. *See Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. at 1622 (authorizing sanctions against attorneys who have acted "'vexatiously, wantonly, or for oppressive reasons'"); 28 U.S.C. § 1927 (authorizing sanctions against attorneys who "multipl[y] the proceedings in any case unreasonably and vexatiously"); Fed.R.Civ.P. 11 (authorizing sanctions if attorneys file papers with the court which are not the product of a "reasonable

inquiry" or which are interposed "to cause unnecessary delay or needless increase in the cost of litigation"); Fed.R.Civ.P. 16 (authorizing sanctions if attorneys fail to "participate in good faith" in pretrial conferences). Indeed, in the cases mentioned in the sections above, particularly section V–E, courts have made plain that a variety of theories may be employed to sanction conduct such as that found by the district court in this case.

to assume the sanctions erroneously awarded against Ms. Sumter.

Thus, the award of sanctions against Ms. Sumter is set aside. The award of sanctions against Mr. Chambers, as well as the awards against plaintiffs Harris and Blue, are upheld, subject to the modifications discussed hereinafter.

## VII.

Plaintiffs and counsel maintain that the district court erred in imposing sanctions of the magnitude it did. In particular, they argue that the district court acted beyond its authority in including judicial salaries as a component of the sanctions and in sanctioning them for expenses incurred in the litigation of the sanctions hearing. We will address each of these arguments in turn.

## A.

■ Plaintiffs and counsel charge that the district court erred in imposing upon them a penalty of nearly $38,000 for the expenses, including salaries, of the court and its staff. They maintain that such a severe sanction threatens the court's appearance of impartiality and creates an unnecessary deterrent to use of the court system.

We find merit in this view. While the Judicial Code provides that a court may tax as court costs such expenses as the fees of the court clerk, marshal, and court reporter, it nowhere permits a district court to tax as expenses judicial salaries or the salaries of its law clerk and other staff members. 28 U.S.C. § 1920; *see also Ray A. Scharer & Co. v. Plabell Rubber Prods.*, 858 F.2d 317, 321 (6th Cir.1988) (expressing "doubt ... that the court may or should assess its 'costs of operation' as sanctions"). As bodies which are not subject to direct democratic control, courts should be hesitant to create their own fee-shifting provisions, for to do so runs the risk of "mak[ing] major inroads on a policy matter that Congress has reserved for itself." *Alyeska Pipeline*, 421 U.S. at 269, 95 S.Ct. at 1627. Imposing the costs of judicial salaries, including those of law clerks, upon litigants as a sort of "user fee" sanction

may operate as an impediment to judicial access for those with legitimate claims.

We do not hold that it is never appropriate for a district court to assess against a party nominal court expenses not provided for in 28 U.S.C. § 1920. We have previously approved a sanction of $2,000 for juror costs imposed pursuant to local rule. *See White v. Raymark Indus.*, 783 F.2d 1175 (4th Cir.1986). Similarly, at least one other court has upheld a $390 sanction representing the district court's cost of impanelling jurors incurred because of a delay in settlement. *See Eash v. Riggins Trucking*, 757 F.2d 557 (3d Cir.1985) (en banc). However, we cannot casually endorse a sanction of the magnitude of the one here which seeks to tax litigants with the cost of judicial salaries. We therefore set aside the sanctions for court salaries, leaving intact the imposition of court costs for the expenses of the clerk of the court and the court reporter which are authorized under 28 U.S.C. § 1920.

## B.

Plaintiffs and counsel also challenge the propriety of the district court's award of sanctions for the prosecution and trial of the sanctions motions. They point to language in this circuit's opinion in *Introcaso v. Cunningham Corp.*, 857 F.2d 965 (4th Cir.1988), disallowing sanctions based on "litigation activity and associated expenses for defendant's motion for attorney's fees under § 1988 and Rule 11." *Id.* at 970. They also contend that there were no findings by the district court that their conduct in opposing the sanctions motions was frivolous or improper.

■ We agree that the district court erred in imposing sanctions on counsel for opposing the sanctions motions. Litigants should be able to defend themselves from the imposition of sanctions without incurring additional sanctions. The district court's findings of misconduct with respect to the attorneys was centered upon their widespread failure to investigate the factual bases for their clients' claims and to review the materials obtained in discovery,

not upon their conduct during the sanctions hearings. We thus find no sanctionable conduct in the attorneys' opposition to the sanctions motions.

■ Plaintiffs, on the other hand, were found by the district court to have engaged in numerous instances of untruthfulness during the course of their testimony at the sanctions hearing. To rule that sanctions can never be imposed on a party for misconduct during a sanctions hearing, no matter how egregious, would be to license the wholesale abuse of these hearings. Because plaintiffs were found to have perjured themselves during the sanctions hearing, the sanctions imposed upon them for the conduct of the hearing must stand. Thus, we set aside the sanctions arising out of the prosecution of the sanctions hearing with respect to counsel, but sustain the sanctions with respect to plaintiffs.

## VIII.

■ Counsel's law firm, Ferguson, Stein, Watt, Wallas & Adkins, challenges the district court's imposition of sanctions against it in the amount of $1,413. The district court based its award of sanctions on the fact that "a number of other lawyers with the firm participated in this case in varying minor ways." 679 F.Supp. at 1392. The firm argues that this vague finding is insufficient to support an award of sanctions. It also questions whether any of the sanctions theories authorize the imposition of sanctions upon a law firm.

We agree that the award of sanctions against the law firm was improper. The district court's statement about the involvement of firm lawyers in the case does not specify any sanctionable conduct on the part of the attorneys, nor are we able to locate any sanctionable conduct in the record. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1268 (2d Cir.1987) (reversing sanctions because of inadequate findings by district court); *Rascator Maritime*, 782 F.2d at 345 (same). Because there is no basis in this record upon which to sanction the law firm, we need not address the question whether a law firm can ever be sanctioned under the theories invoked by the district court. We note, however, that the Supreme Court has ruled that Rule 11 does not authorize sanctions against a law firm, *see Pavelic & Leflore v. Marvel Entertainment Group*, ── U.S. ──, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), and that we are doubtful that the other sanctions theories will support sanctions against an entire firm rather than against the individual lawyers who acted improperly. Thus, the sanctions against Ferguson, Stein, Watt, Wallas & Adkins are hereby set aside.

## IX.

■ The NAACP Legal Defense Fund complains that the district court was without the authority to order it not to pay the sanctions on behalf of counsel. The Legal Defense Fund argues that it was not before the district court, that the court had no basis upon which to order it not to pay the sanctions, and that by interfering with its decisions regarding allocation of its resources the order interfered with its First Amendment rights of free speech and association.

The Supreme Court has made it clear that a district court may impose its sanctions solely upon the responsible attorneys and has approved the "greater economic deterrence" achieved thereby. *Pavelic v. LeFlore*, 110 S.Ct. at 460. In this case, however, the district court did not order the Legal Defense Fund not to pay the sanctions because of a concern that plaintiffs and counsel would not be sufficiently deterred, but instead because of a concern that the Legal Defense Fund's resources be spent on worthy causes. The court stated that "[t]he NAACP is an historic institution that has contributed substantially to the racial progress of this country. It continues to serve this vital purpose and the court does not propose to see any money diverted from its crucial mission." 679 F.Supp. at 1392 n. 280. However well-intentioned the district court may have been, a concern for how the Legal Defense Fund allocates its monies is not a legitimate basis on which to order it not to pay sanctions. Thus, we need not address the other issues

raised by the Legal Defense Fund. The order that it pay no monies toward the sanctions is vacated.

## X.

 Finally, Chambers and Sumter argue that the district court acted improperly in adjudging them to have violated the North Carolina Rules of Professional Conduct. They contend that the district court failed to follow its own local rules in disciplining the attorneys, and that this requires that the disciplinary finding be vacated.

We agree. Rule 105.01 of the Rules of Disciplinary Procedure adopted by the United States District Court for the Eastern District of North Carolina requires that when any "misconduct on the part of an attorney admitted to practice before this court which, if substantiated, would warrant discipline" comes to the attention of a judge of the court "by complaint or otherwise," that judge must "refer the matter to counsel for investigation and if warranted the prosecution of a formal disciplinary proceeding." The Rules further provide that "if the disciplinary proceeding is predicated upon the complaint of a judge of this court the hearing shall be conducted before another judge of this court." E.D.N.C. Disc.R. 105.04. The district court plainly did not follow these procedures in this case, instead imposing the disciplinary penalty sua sponte based on its own observations of counsel's behavior.

The district court maintained, however, that it was authorized to discipline the attorneys as it did under Rule of Disciplinary Procedure 112.00. That Rule establishes that "[n]othing contained in these Rules shall be construed to deny to this court such powers as are necessary for the court to maintain control over proceedings conducted before it, such as proceedings for contempt." E.D.N.C.Disc.R. 112.00. We think this provision was not intended, as the district court believed, to allow a district court to impose disciplinary penalties at its own behest for any unethical conduct which occurs before it, but rather to allow a court the ability to deal summarily with disruptive conduct in the courtroom.

Where, as here, an attorney's conduct does not threaten the orderly administration of justice in the courtroom, a district court should follow the procedures set forth in Rules 105.01–04 providing, *inter alia*, for notice, an opportunity to be heard, and an independent arbiter. *Cf. In re Chaplain*, 621 F.2d 1272, 1275 (4th Cir.1980) (exercise of summary contempt powers may only be appropriate "when immediate action is required to preserve order in the proceedings and appropriate respect for the tribunal"). Because the district court failed to follow these procedures in this case, we vacate the district court's reprimand of counsel for a breach of professional ethics and the accompanying fine. *See In re Thalheim*, 853 F.2d 383, 386–88 (5th Cir.1988); *In re Abrams*, 521 F.2d 1094, 1104–05 (3d Cir. 1975).

## XI.

This case is not one of a district court sanctioning attorneys and their clients for forwarding novel legal claims. Rather, it is a case in which a district court imposed sanctions because the parties and counsel pressed on a massive scale insubstantial claims unsupported by any credible evidence. The parties were found not to have abandoned their frivolous claims until the very eve of trial, to have maintained plainly baseless suits, and to have perjured themselves on the witness stand, all in an effort to harass the defendant. Counsel was found to have shirked its responsibility to explore the factual bases for the clients' suits and to examine the materials obtained in discovery, instead charging forward with the litigation in disregard of its manifest lack of merit. Such conduct cannot be condoned.

The district court therefore did not abuse its discretion in determining that the conduct warranted appropriate sanctions. But, for reasons earlier given, we are satisfied that the court then failed to exercise sufficient selectivity in imposing the wide-ranging sanctions that it chose and sufficient sensitivity to the deterrent effect its decision might create upon future Title VII litigants with meritorious claims. In our view, this did constitute an abuse of the court's discretion which we are obliged to

correct in the exercise of our reviewing function.

We have not happily assumed the task of upholding an award of sanctions against a distinguished attorney or of overturning the exercise of discretion on the part of a conscientious district judge, but our review of the record has left us no choice. To recapitulate our holding: the sanction against Ms. Sumter is set aside in its entirety; the sanction against Mr. Chambers is upheld, but is reduced by the amounts awarded for judicial salaries and for defense of the sanctions hearing; the sanctions against Ms. Harris and Ms. Blue are upheld, but are reduced by the amounts awarded for judicial salaries; the sanction against the law firm Ferguson, Stein, Watt, Wallas & Adkins is set aside; the order directing the NAACP Legal Defense Fund to pay no monies toward counsel's sanctions is vacated; and the reprimand of counsel for a breach of professional ethics and its accompanying fine are also vacated.

\* \* \* \* \* \*

The judgment of the district court is affirmed in part and reversed in part, and this case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.